# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-3722
_____

United States of America

*Plaintiff - Appellee*

v.

Wicahpe George Milk

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of South Dakota - Western
_____

Submitted: October 20, 2022
Filed: May 3, 2023
_____

Before KELLY, WOLLMAN, and KOBES, Circuit Judges.
_____

KELLY, Circuit Judge.

Wicahpe Milk was convicted by a jury of conspiracy to distribute 500 grams or more of a substance containing methamphetamine, possession of a firearm as a convicted felon, and obstruction of justice. On appeal, Milk challenges several district court decisions that span from indictment through sentencing. After careful review of the record and of all issues raised on appeal, we affirm.

## I.

"We present the facts in a light most favorable to the verdicts, drawing all reasonable inferences from the evidence that support the jury's verdicts." United States v. Ramon-Rodriguez, 492 F.3d 930, 934 (8th Cir. 2007). In January 2015, Milk moved to California after he was released from federal prison on an unrelated offense. Shortly thereafter, Milk turned to distributing methamphetamine. Milk used his cousin, Frank Milk (Frank), as one of his first distributors. In late-summer 2015, Frank traveled from South Dakota to California to visit Milk. While there, Milk advanced, or "fronted," distribution-level quantities of methamphetamine for Frank to sell in South Dakota, and Frank agreed to bring his profits back to Milk. Frank, on his return to South Dakota, enlisted the help of "trusted" associates to sell the drugs. Frank later made two more trips to California, each time receiving distribution-level quantities of methamphetamine from Milk.

Milk, too, made at least two trips to South Dakota to sell methamphetamine he transported from California. The Lakota Prairie Ranch Resort in Kyle, South Dakota, served as the initial "base of operations" for Milk's drug activity, and Milk rented rooms at this motel to engage in drug transactions. Milk soon became known as the drug source, or "plug," to his distributors and associates. Frank and several others, including Harold Brewer and Julissa Poor Bear, served as Milk's distributors. Milk frequently fronted them large quantities of methamphetamine that they quickly sold throughout South Dakota.

Milk later relocated from California to South Dakota, and he continued to acquire his methamphetamine from California. Milk rented a house called Turtle Creek in Rapid City, South Dakota, where he lived with Poor Bear, Brewer, and others. Together, Milk and his distributors regularly engaged in drug deals inside the home. Isaac Francis, owner of the Turtle Creek home, occasionally obtained user-level quantities of methamphetamine from Milk and Poor Bear, and the two sometimes paid him for rent with methamphetamine. Neighbors complained of the noise and foot traffic in and out of the home, and after two or three months, Francis

asked Milk and the others to move out. Milk and Poor Bear relocated to the Pine Ridge Reservation in Wanblee, South Dakota, where the two continued selling drugs.

On August 17, 2016, Milk was arrested by local law enforcement during a traffic stop in Box Elder, South Dakota. Officers discovered 156.12 grams of methamphetamine, a handgun, and drug paraphernalia in the vehicle.[1] On April 18, 2017, a federal grand jury returned a superseding indictment charging Milk with conspiracy to distribute 500 grams or more of a mixture or substance containing methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846, and possession of a firearm as a convicted felon, in violation of 18 U.S.C. §§ 922(g)(l). Milk's case was later joined with two of his alleged co-conspirators, Brewer and Poor Bear. Brewer and Poor Bear soon entered guilty pleas. Milk pleaded not guilty.

Milk remained incarcerated in the Pennington County Jail in Rapid City, South Dakota, pending his trial. Brewer, incarcerated in the same jail, began receiving contraband jailhouse notes from Milk about Brewer's statements to law enforcement. Milk's notes to Brewer said things like, "Tell them nothing," "[I]f you tell them about any dope you gonna get us jambed up," "Get that story recanted," and "Follow my lead and stick to the code of silence." In other notes, Milk demanded that Brewer call his own or Milk's attorney to explain that Brewer's previous statements to law enforcement were "lie[s]." On April 16, 2019, the government obtained a second superseding indictment against Milk, adding a charge for obstruction of justice in violation of 18 U.S.C. § 1503.

Later, law enforcement received information that Milk and several other inmates were attempting to intimidate a witness—also an inmate at the jail—who was scheduled to testify in the criminal trial of one of Milk's distributors. The government responded by establishing a "taint team," composed of an investigating

---

[1]Milk was a back-seat passenger in the car, a red Pontiac Grand Prix, which was borrowed from another man.

agent and attorney separate from the team investigating and prosecuting Milk, to search Milk's jail cell for evidence of witness tampering. The taint team initially screened the materials seized from Milk's cell for any potentially privileged documents before turning the remaining documents over to the prosecution team.

Before trial, Milk filed several pretrial motions, which the district court[2] denied in whole or in part, and the case proceeded to trial. After the jury returned guilty verdicts on all counts, Milk moved to dismiss the case for lack of jurisdiction. The district court[3] denied the motion. Milk received a sentence of 360 months of imprisonment on the drug conspiracy count and 120 months of imprisonment on the firearm and obstruction of justice counts, with all sentences to run concurrently, followed by 5 years of supervised release.

## II.

On appeal, Milk challenges several of the district court's pre- and post-trial rulings, argues the evidence was insufficient to support his convictions, and challenges the calculation of his advisory Guidelines range at sentencing. We address Milk's various arguments in turn and present additional facts as relevant to the arguments.

## A.

We begin with Milk's assertion that the district court lacked subject matter jurisdiction over his case. "The issue of whether federal subject matter jurisdiction

---

[2]The Honorable Jeffrey L. Viken, then Chief Judge for the District of South Dakota, adopting the report and recommendation of the Honorable Judge Daneta Wollmann, United States Magistrate Judge for the District of South Dakota.

[3]The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota.

exists is subject to de novo review." United States v. Thunder Hawk, 127 F.3d 705, 706 (8th Cir. 1997).

Milk, who is Native American and an enrolled member of the Oglala Sioux Tribe, contends that the district court lacked jurisdiction because (1) he was convicted of crimes that are not enumerated under the Major Crimes Act, 18 U.S.C. § 1153,[4] and (2) under the General Crimes Act, 18 U.S.C. § 1152, the alleged unlawful acts in this case occurred on the Pine Ridge Reservation and only involved American Indian people.[5]  But Milk's arguments are foreclosed by precedent.  As we have recognized, federal laws of general application—that is, "those in which [the] situs of the offense is not an element of the crime,"—apply on Indian reservations, even to offenses committed by an Indian person against the person or property of another Indian person.  United States v. Wadena, 152 F.3d 831, 841 (8th Cir. 1998); see United States v. Drapeau, 414 F.3d 869, 877 (8th Cir. 2005) ("We have held that [the General Crimes Act] and its exceptions 'do not extend or restrict the application of general federal criminal statutes to Indian reservations.'" (quoting United States v. Blue, 722 F.2d 383, 384 (8th Cir. 1983)). And while Milk further contends that the district court lacked jurisdiction under the

---

[4]The Major Crimes Act provides that the United States has "exclusive jurisdiction" over any Native American person who commits "murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, a felony assault under section 113, an assault against an individual who has not attained the age of 16 years, felony child abuse or neglect, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country."  18 U.S.C. § 1153(a).

[5]The General Crimes Act provides, in relevant part, that "the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States . . . shall extend to the Indian country," but "shall not extend to offenses committed by one Indian against the person or property of another Indian, . . . or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes."  18 U.S.C. § 1152.

Fort Laramie Treaty,[6] this argument, too, is foreclosed by precedent. See United States v. Jacobs, 638 F.3d 567, 568 (8th Cir. 2011) (recognizing that we have previously "rejected similar challenges to federal subject matter jurisdiction based upon allegations the United States failed to comply with purported jurisdictional prerequisites in the Fort Laramie Treaty.").

B.

Next, we turn to Milk's appeal of the denial of his motions to suppress evidence seized during the traffic stop and from his jail cell. "In evaluating the denial of a motion to suppress, we review the district court's legal conclusions de novo and factual findings for clear error." United States v. Nyah, 35 F.4th 1100, 1105 (8th Cir. 2022). "We will affirm unless the denial of the motion is unsupported by substantial evidence, is based on an erroneous interpretation of the law, or it is clear, based on the entire record, that a mistake was made." United States v. Walker, 840 F.3d 477, 483 (8th Cir. 2016).

1.

First, Milk contends the August 17, 2016, traffic stop was unlawful. The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. "Under the Fourth Amendment, a traffic stop is reasonable if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred." Walker, 840 F.3d at 483 (quoting United States v. Washington, 455 F.3d 824, 826 (8th Cir. 2006)). "Any traffic violation, however minor, provides probable cause for a traffic stop." United States v. Adler, 590 F.3d

---

[6]The Treaty, in relevant part, states, "If bad men among the Indians shall commit a wrong or depredation upon the person or property of any one, . . . the Indians herein named solemnly agree that they will, upon proof made to their agent, and notice by him, deliver up the wrongdoer to the United States, to be tried and punished according to its laws." Treaty of Fort Laramie, art. I, April 29, 1868, 15 Stat. 635.

581, 583 (8th Cir. 2009) (quoting United States v. Wright, 512 F.3d 466, 471 (8th Cir. 2008)).

Deputy Keith Carlson conducted the traffic stop, and he stated that in the early morning hours of August 17, while on "saturation patrol,"[7] he observed a red Pontiac driving erratically. Carlson testified that he saw the car sit at a stop sign for "approximately 30 seconds," drive "into the gravel area" of the road's shoulder before "jerking back into the roadway," and then "braking randomly[,] slowing down[,] and speeding up." The district court credited this testimony. Milk nonetheless argues that Carlson was "fibbing." But "[a] credibility determination made by a district court after a hearing on the merits of a motion to suppress is virtually unassailable on appeal." United States v. Morris, 915 F.3d 552, 555 (8th Cir. 2019) (quotations omitted). And Deputy Carlson's dashcam video from his patrol vehicle captured the Pontiac crossing the center line of the roadway. We find no clear error in the district court's factual findings and agree that Deputy Carlson had probable cause to stop the Pontiac.

Next, Milk challenges the warrantless search of the Pontiac. "Under the automobile exception to the Fourth Amendment's warrant requirement, a police officer who has lawfully made a roadside stop of a vehicle may search the passenger compartment and trunk of that vehicle if probable cause exists to believe that contraband or evidence of criminal activity is located inside the vehicle." Walker, 840 F.3d at 483. As Deputy Carlson approached the Pontiac, he smelled the odor of marijuana coming from the car, and the driver appeared inebriated or under the influence of a controlled substance. Milk challenges neither of these factual findings. "We have repeatedly held that the odor of marijuana provides probable cause for a warrantless search of a vehicle under the automobile exception." United States v. Williams, 955 F.3d 734, 737 (8th Cir. 2020); see Walker, 840 F.3d at 483 ("The odor of unburned marijuana can be highly probative in establishing probable

---

[7]Deputy Carlson's duties while on "saturation patrol" involved patrolling the area to "[e]nforce traffic laws" while "focusing on alcohol or drug-impaired drivers."

cause for a search."). Because both the stop and the search of the Pontiac were supported by probable cause, the district court did not err in denying Milk's suppression motion.[8]

2.

Before trial, Milk filed a motion to suppress evidence seized from his jail cell on Sixth Amendment grounds, arguing that the materials seized included attorney-client privileged information and his work product. See In re Search Warrant Issued June 13, 2019, 942 F.3d 159, 174 (4th Cir. 2019) (noting that the attorney-client privilege and the work-product doctrine "jointly support the Sixth Amendment's guarantee of effective assistance of counsel"). After a hearing, the magistrate judge recommended that most of the documents seized be suppressed because they were protected by the work-product doctrine. Milk objected, arguing that dismissal of the indictment, not merely suppression of the evidence, was the appropriate remedy. The district court overruled the objection, finding that suppression alone was appropriate, and adopted the magistrate judge's recommendation.

On appeal, Milk reasserts his argument that the proper remedy was dismissal of the indictment. But the remedy for any Sixth Amendment violation "should be tailored to the injury suffered . . . and should not unnecessarily infringe on competing interests." United States v. Morrison, 449 U.S. 361, 364 (1981). And here, the district court prohibited the government from using the privileged documents or their contents at trial. Further, the district court required the government to establish that any evidence it sought to use at trial was derived from sources independent of the evidence seized from Milk's cell. Milk offers nothing to suggest the government violated that order by making use of the suppressed documents or information gleaned from them at trial. Accordingly, we discern no abuse of discretion in the

---

[8]Having found no error in the district court's probable cause determination, we need not address Milk's argument concerning his standing to challenge the stop and search of the vehicle. And in any event, the district court assumed that Milk had standing.

remedy crafted by the district court.  See United States v. Woods, 978 F.3d 554, 564 (8th Cir. 2020) (reviewing the district court's "fashioning of a remedy short of dismissal" for abuse of discretion).

C.

Milk argues that the delay between his arrest on August 17, 2016, and his initial appearance before a federal magistrate judge on September 26, 2016, violated Federal Rule of Criminal Procedure 5(a)(1)(A) and that the indictment must be dismissed as a result.  Because Milk did not raise this claim to the district court, we review it for plain error.  See United States v. Pirani, 406 F.3d 543, 549 (8th Cir. 2005) (en banc); Fed. R. Crim. P. 52(b).

Under Rule 5(a), "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge."  Fed. R. Crim. P. 5(a)(1)(A).  But the rule "applies only to persons arrested and held under federal law."  United States v. Cooke, 853 F.3d 464, 470 (8th Cir. 2017) (quoting United States v. Elliott, 435 F.2d 1013, 1015 (8th Cir. 1970)).  In the absence of a federal arrest, the rule may apply only "when there is evidence indicating that the arrest and detention by [a] state official were at the request of federal authorities or for the purpose of assisting them."  Id. (quoting United States v. Jarrett, 423 F.2d 966, 971 (8th Cir. 1970)).

When Milk was arrested on August 17, 2016, he was taken into state custody. Milk has offered no evidence to suggest he was held in state custody at the direction of or in concert with federal officers.  As a result, Rule 5(a) is not applicable.  Milk was not arrested on federal charges until September 26, 2016, and he made his initial appearance the same day.  There was no Rule 5(a) violation, plain or otherwise.

-9-

D.

Milk also appeals the district court's denial of his motion for a bill of particulars on his conspiracy charge. "We review a district court's ruling regarding a bill of particulars for abuse of discretion." United States v. Shepard, 462 F.3d 847, 860 (8th Cir. 2006). To establish reversible error based on a denial of his motion, Milk "must show that he was actually surprised at trial and suffered prejudice from the denial." United States v. Livingstone, 576 F.3d 881, 883 (8th Cir. 2009) (quoting United States v. Fleming, 8 F.3d 1264, 1265 (8th Cir. 1993)).

Milk argues the indictment lacked sufficient facts to allow him to mount a defense against the charge of conspiracy. "A bill of particulars serves to inform the defendant of the nature of the charge against him with sufficient precision to enable him to prepare for trial, and to avoid or minimize the danger of surprise at trial." Shepard, 462 F.3d at 860 (cleaned up); see Livingstone, 576 F.3d at 883 ("If a defendant believes that an indictment does not provide enough information to prepare a defense, then he or she may move for a bill of particulars."); Fed. R. Crim. P. 7(f). But a bill of particulars "is not to be used for discovery purposes." United States v. Hill, 589 F.2d 1344, 1352 (8th Cir. 1979). An indictment is sufficient "unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense for which the defendant was convicted." United States v. Bowie, 618 F.3d 802, 817 (8th Cir. 2010) (quoting Fleming, 8 F.3d at 1265).

The indictment here set forth the elements of the offense, apprised Milk of the type of drugs involved, and specified the time frame of the alleged drug conspiracy. This was sufficient to inform Milk of the basis for the charge. See United States v. Huggans, 650 F.3d 1210, 1218 (8th Cir. 2011) (holding that an indictment for conspiracy to distribute a controlled substance provides "'specific facts constituting the offense' if it apprises the defendant of the time frame of the alleged drug conspiracy and the type of drugs involved" (citation omitted)). Further, Milk concedes the government provided voluminous discovery prior to trial, including proffer statements and witness interviews. Milk has failed to show any actual

surprise at trial or prejudice.  See United States v. Maull, 806 F.2d 1340, 1346 (8th Cir. 1986) (finding no prejudice or surprise where, in response to the defendant's motion for a bill of particulars, the government provided the names of unindicted conspirators and the statements of relevant individuals).  The district court did not abuse its discretion in denying Milk's motion for a bill of particulars.

E.

Milk argues that the district court abused its discretion when it refused to sever the conspiracy, firearm, and obstruction counts for trial under Federal Rule of Criminal Procedure 14.  Rule 14 allows for severance if "the joinder of offenses . . . appears to prejudice a defendant."  Fed. R. Crim. P. 14(a).  "We review denial of severance under Rule 14 for an abuse of discretion and will reverse only upon a showing of severe prejudice, that is, if the defendant would have had 'an appreciable chance for an acquittal' in a severed trial."  United States v. Reichel, 911 F.3d 910, 915 (8th Cir. 2018) (quoting United States v. Geddes, 844 F.3d 983, 988 (8th Cir. 2017)).  "No prejudice results from the refusal to sever when evidence of one charge would be admissible in a separate trial on the other."  United States v. Mink, 9 F.4th 590, 604 (8th Cir. 2021) (quoting United States v. McCarther, 596 F.3d 438, 442 (8th Cir. 2010)).

Evidence that Milk unlawfully possessed a firearm would have been admissible in a separate trial on the conspiracy charge because Milk was alleged to have possessed the firearm during the drug conspiracy.  The government's evidence showed that Milk possessed distribution-quantity drugs and a firearm simultaneously, making his possession of the firearm relevant to the charged drug conspiracy.  See United States v. Jones, 880 F.2d 55, 61–62 (8th Cir. 1989).  And in a separate trial for obstruction, evidence of Milk's conspiracy and firearm charges would have been probative and admissible to show his intent or motive for seeking to influence a witness's testimony on those underlying charges.  See United States v. Rock, 282 F.3d 548, 552 (8th Cir. 2002) (finding no showing of prejudice where the defendant's "felon-in-possession charge would have been admissible in a

separate trial of the witness tampering charge, because [his] witness tampering was an attempt to avoid prosecution of the firearms charge"). Under these circumstances, Milk has not shown that he would have had an appreciable chance for an acquittal on any count had the trials been severed. See Reichel, 911 F.3d at 915.

Milk nonetheless contends he was prejudiced because he "had to make the decision to testify as to all or none of the counts." But "[a] defendant arguing for severance on this basis must make a 'persuasive and detailed showing regarding the testimony he would give on the one count he wishes severed and the reason he cannot testify on the other counts.'" McCarther, 596 F.3d at 443 (quoting United States v. Possick, 849 F.2d 332, 338 (8th Cir. 1988)). Milk's bare assertion fails to make the requisite showing. See United States v. Little Dog, 398 F.3d 1032, 1037 (8th Cir. 2005) (holding that a defendant's contention that "he was prejudiced because he did not want to testify to the obstruction charge but did want to testify to the sexual charges" was "not enough to require severance"). The district court did not abuse its discretion in denying Milk's motions to sever.

F.

Milk next argues that 18 U.S.C. § 1503, the federal obstruction-of-justice statute under which he was convicted, criminalizes protected speech in violation of the First Amendment and is unconstitutionally vague in violation of the Fifth Amendment's due process clause. "We review a challenge to the constitutionality of a federal statute de novo." United States v. Betcher, 534 F.3d 820, 823 (8th Cir. 2008).

18 U.S.C. § 1503(a) provides that whoever "corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice," shall be subject to criminal penalties. Milk argues that his prosecution under § 1503 abridged his First Amendment right to free speech and association as applied to the conduct charged. We disagree. The indictment charged Milk with "endeavor[ing]

to *corruptly influence*, obstruct and impede the due administration of justice in *United States v. Milk . . .* and *United States v. Poor Bear . . .* by writing and causing to be delivered letters to a witness *to discourage and alter his testimony at such proceedings*." Milk has failed to make any colorable showing that the First Amendment shields such speech. See United States v. Parker, 871 F.3d 590, 605 (8th Cir. 2017) (finding that the defendant's conduct did not fall within the confines of the First Amendment where the facts at trial showed that he "conspired to threaten government witnesses"); United States v. Jeter, 775 F.2d 670, 678 (6th Cir. 1985) (holding that the defendant's unlawful disclosure of secret grand jury testimony was "merely another type of ordinary criminal communication in a conspiracy that has been traditionally found undeserving of any First Amendment protection").

Milk also argues that the phrase "due administration of justice" in § 1503 is void for vagueness because it fails to apprise the public or defendants of the nature of the prohibited conduct. "A statute is unconstitutional for vagueness if it fails to provide adequate notice of the proscribed conduct or lends itself to arbitrary enforcement." United States v. Tebeau, 713 F.3d 955, 961 (8th Cir. 2013) (cleaned up) (quoting United States v. Birbragher, 603 F.3d 478, 485 (8th Cir. 2010)). "When reviewing for vagueness, we first determine if a statute is vague as applied to the defendant's conduct, and only if it is will we consider whether a statute is facially unconstitutional." United States v. KT Burgee, 988 F.3d 1054, 1060 (8th Cir. 2021).

For an as-applied challenge, "we look to whether the statute gave adequate warning, under a specific set of facts, that [Milk's] behavior was a criminal offense." United States v. Palmer, 917 F.3d 1035, 1038–39 (8th Cir. 2019) (quoting United States v. Washam, 312 F.3d 926, 931 (8th Cir. 2002)). Milk's only argument is that the phrase "due administration of justice" can mean "anything that a prosecutor or judge says it is." But the evidence showed that Milk engaged in conduct that was intended to discourage a witness from testifying, or to convince him to change his testimony, at proceedings in Milk's and Poor Bear's federal criminal cases. These allegations, included in the indictment, gave Milk adequate warning of the nature of the conduct as well as the proceedings the conduct was intended to obstruct. The

-13-

statute also contains a mens rea requirement that limits its scope to those who act "corruptly." 18 U.S.C. § 1503(a); see Posters 'N' Things, Ltd. v. United States, 511 U.S. 513, 526 (1994) (noting that scienter requirements in criminal statutes may "assist[] in avoiding any vagueness problem"). Under the facts of this case, Milk has failed to show that § 1503(a) was unconstitutionally vague as applied to him.

G.

We now address whether the evidence was sufficient to sustain Milk's convictions. Our review is de novo, "viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." United States v. Maurstad, 35 F.4th 1139, 1144 (8th Cir. 2022) (quoting United States v. Casteel, 717 F.3d 635, 644 (8th Cir. 2013)). "We will reverse only if no reasonable jury could have found [Milk] guilty beyond a reasonable doubt." Id.

1.

To convict Milk of conspiracy to distribute a controlled substance under 21 U.S.C. § 846, the government must prove (1) "a conspiracy to distribute methamphetamine existed"; (2) Milk "knew about the conspiracy"; and (3) Milk "knowingly became a part of the conspiracy." United States v. Lewis, 976 F.3d 787, 794 (8th Cir. 2020). "The conspiracy's existence may be proved by direct or circumstantial evidence." United States v. Cain, 487 F.3d 1108, 1111 (8th Cir. 2007) (quoting United States v. Sanchez-Garcia, 461 F.3d 939, 945 (8th Cir. 2006)).

Milk contends that there was insufficient evidence of his participation in a conspiracy to distribute methamphetamine in part because the government failed to present "objective evidence," such as a controlled buy, at trial. But "evidence at trial that consists primarily of testimony from other members of the conspiracy may suffice to establish [a] defendant's guilt." United States v. Conway, 754 F.3d 580, 587 (8th Cir. 2014). The evidence demonstrated that Milk was the link between

-14-

methamphetamine sourced from California and a network of distributors in South Dakota and that he recruited others to distribute drugs for him, thereby intentionally joining the conspiracy. See id. at 588 ("When evidence exists that large amounts of drugs were distributed over an extended period of time, including fronting transactions, there is ample evidence to support a conspiracy.").

Milk questions the credibility of most witnesses who testified, but we defer to the jury's assessment of witness credibility and will not reweigh the evidence or the credibility of the government's witnesses. See United States v. Moya, 690 F.3d 944, 950 (8th Cir. 2012); United States v. Taylor, 813 F.3d 1139, 1147 (8th Cir. 2016). Viewing the evidence in the light most favorable to the verdict, it was sufficient to allow a jury to find beyond a reasonable doubt that there was a conspiracy between Milk and others to distribute methamphetamine in the amounts charged, that Milk knew about the conspiracy, and that he intentionally joined it.

2.

To support a conviction for possession of a firearm as a convicted felon, the government must establish that (1) Milk had been previously convicted of a crime punishable by a term of imprisonment exceeding one year; (2) Milk knowingly possessed a firearm; (3) the firearm was in or affecting interstate commerce; and (4) Milk knew he belonged to the relevant category of persons barred from possessing a firearm. United States v. McKee, 42 F.4th 910, 913 (8th Cir. 2022).

Milk challenges only the second element, arguing that the government failed to prove he knowingly possessed the firearm found in the Pontiac when he was arrested on August 17. This element may be satisfied by proof of actual or constructive possession. United States v. Green, 835 F.3d 844, 852 (8th Cir. 2016). "To show constructive possession, the government must prove that the defendant had dominion over the premises where the firearm was located, or control, ownership, or dominion over the firearm itself." United States v. Parsons, 946 F.3d 1011, 1014 (8th Cir. 2020) (cleaned up) (quoting United States v. Maxwell, 363 F.3d

815, 818 (8th Cir. 2004)). "Mere physical proximity to a firearm is not enough to show constructive possession, but knowledge of a firearm's presence, combined with control is constructive possession." United States v. Battle, 774 F.3d 504, 511 (8th Cir. 2014) (alterations omitted) (quoting United States v. Mann, 701 F.3d 274 304–05) (8th Cir. 2014)).

The government presented evidence that Milk had dominion over the Pontiac, where the firearm was found. The testimony at trial showed that Milk borrowed the car from another man, who emptied and cleaned out the vehicle before loaning it to Milk. Milk's personal items, including at least one purchase receipt, were found inside the vehicle. The government also presented evidence that Milk had knowledge of the firearm. The gun was recovered from inside a red drawstring bag in the Pontiac, and surveillance footage showed Milk leaving a Walmart carrying the same distinctive red bag one hour before the Pontiac was stopped. Deputy Carlson also testified that, although the red drawstring bag was found on the floor of the front passenger side while Milk sat in the rear passenger side, he saw the occupants of the vehicle move around after he initiated his traffic stop, suggesting the occupants may have rearranged themselves or their belongings. Finally, the government presented evidence that Milk on occasion traded methamphetamine for guns. Under these facts, a jury could conclude beyond a reasonable doubt that Milk knowingly possessed the firearm as charged.

3.

Turning to Milk's charge for obstruction of justice, 18 U.S.C. § 1503 prohibits persons from "endeavor[ing] to influence, obstruct, or impede[] the due administration of justice." 18 U.S.C. § 1503(a). To sustain a conviction under § 1503, the government must show that Milk's "endeavor" had the "natural and probable effect of interfering with the due administration of justice." United States v. Aguilar, 515 U.S. 593, 599 (1995) (quotations and citations omitted); see also United States v. Beale, 620 F.3d 856, 865 (8th Cir. 2010) ("A conviction under

1503(a) requires proof of a sufficient nexus between each defendant's actions and an intent to impede judicial proceedings.").

Milk argues the evidence is insufficient to support the verdict because the government failed to establish that anyone was intimidated by his alleged obstructive conduct or that his actions caused a witness to testify falsely. But to convict under § 1503, the government need not demonstrate that justice was in fact obstructed. See Aguilar, 515 U.S. at 599 ("[T]he defendant's actions need [not] be successful; an 'endeavor' suffices."). Rather, the government sufficiently established that Milk, with knowledge of the pending proceedings, sent multiple notes to Brewer demanding that he "fabricate" a new "story" or recant his previous statements to law enforcement before Milk's trial. Milk maintains that there was no evidence he was the author of these notes, but their contents included references, language, and other facts specific to Milk and Brewer. Viewing this evidence in the light most favorable to the verdict, a rational jury could have found Milk guilty of this charge beyond a reasonable doubt.

## H.

Finally, we address the challenges to the calculation of Milk's Guidelines range. We review the district court's interpretation and application of the Guidelines de novo, and we review findings of fact for clear error. See Lewis, 976 F.3d at 797.

## 1.

The district court applied a two-level enhancement pursuant to United States Sentencing Guidelines § 2D1.1(b)(12) (2021), finding that Milk "maintained a premises for the purpose of manufacturing or distributing a controlled substance," specifically, the Turtle Creek residence. For the enhancement to apply, drug manufacturing or distribution must be among the primary or principal uses for the premises, but these "need not be the sole purpose for which the premises was maintained." United States v. Hernandez Lopez, 24 F.4th 1205, 1208 (8th Cir.

2022). Among the factors a court considers in determining whether a defendant "maintained" a premises for drug distribution are (a) whether the defendant owned or rented the premises, and (b) the extent to which he or she "controlled access to, or activities at, the premises." USSG § 2D1.1, comment. (n.17).

Milk's only argument is that he did not own, reside at, or control access to the Turtle Creek house. Although Milk did not own the house, the evidence established that he lived there for a few months and paid rent for the property, which he sometimes paid with methamphetamine. The evidence also showed that Milk exercised control over the house, including who lived at Turtle Creek and the nature of the drug trafficking that took place there. We discern no clear error in the district court's findings, which support the application of the two-level enhancement under § 2D1.1(b)(12).

2.

Finally, Milk argues that the district court clearly erred in calculating the drug quantity for purposes of establishing his base offense level. When calculating drug quantity in a conspiracy case, the district court may consider "drug quantities attributable directly to the defendant as well as quantities attributable to the reasonably foreseeable actions of others taken to further the conspiracy." United States v. Young, 689 F.3d 941, 945 (8th Cir. 2012); see also United States v. Washington, 968 F.3d 860, 865 (8th Cir. 2020). Where, as here, there is "no drug seizure or the amount seized does not reflect the scale of the offense," the district court "shall approximate the quantity of the controlled substance." Young, 689 F.3d at 945 (quoting United States v. Pugh, 25 F.3d 669, 677 (8th Cir. 1994)). The district court's approximation may be "based on imprecise evidence so long as the record reflects a basis for the court's decision." United States v. Yellow Horse, 774 F.3d 493, 497 (8th Cir. 2014) (quoting United States v. Roach, 164 F.3d 403, 413–14 (8th Cir. 1998)).

Milk contends the drug quantity attributed to him was based solely on "arbitrary estimations" and "speculation." But the district court's findings of drug quantities were supported by the evidence. Multiple witnesses testified consistently about the amount of methamphetamine they received from Milk or that they personally observed him with. And because Frank, Brewer, Poor Bear, and others were members of the same conspiracy, the court permissibly attributed the quantities they distributed over the course of the conspiracy to Milk in the sentencing calculation. Some of the evidence presented at trial regarding quantity was admittedly imprecise. But the government substantiated this evidence with expert testimony from Special Agent Dan Cooper, who approximated the weight of the methamphetamine based on testimony elicited from other witnesses at trial. The district court did not clearly err in its quantity determination.

## III.

Based on the foregoing, we affirm the judgment of the district court.

_____