# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-1332

_____

United States of America

*Plaintiff - Appellee*

v.

Melroy Johnson, Sr.

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Western

_____

Submitted: April 13, 2023
Filed: July 27, 2023

_____

Before LOKEN, SHEPHERD, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

Melroy Johnson, Sr., was convicted by a jury of conspiracy to distribute and possession with intent to distribute methamphetamine. On appeal, Johnson argues that the district court[1] erred by denying his motion to suppress and his motion for

_____

[1]The Honorable Leonard T. Strand, Chief Judge, United States District Court for the Northern District of Iowa, adopting the report and recommendations of the

judgment of acquittal or a new trial, and in calculating the drug quantity for purposes of sentencing.

## I.

Early in 2019, law enforcement began an investigation after it learned of several suspicious mailings between Kimberly Hansen in Sioux City, Iowa, and Felton Fitzgerald in Orange, California. Inspector Ryan Brandt of the United States Postal Service (USPS) reviewed USPS records and discovered that Hansen had received 10 or 11 packages, totaling 40 pounds, from Fitzgerald, and that Hansen had mailed 20 to 24 packages weighing less than a pound to Fitzgerald. Inspector Brandt suspected that Fitzgerald was mailing Hansen drugs and that Hansen was mailing money to Fitzgerald.

On June 6, 2019, Inspector Brandt and Sioux City Police Officer Eric Davis intercepted a package sent by Fitzgerald as it was being delivered to Hansen's home and performed a "knock-and-talk" with Hansen. Hansen consented to a search of the package, which contained roughly five pounds of methamphetamine. Hansen's phone records showed multiple communications between herself and Fitzgerald, and she told the officers that the package's intended recipient was Johnson. Hansen said that Johnson typically gave her money to send back to Fitzgerald to pay for the packages, and she received cocaine and cash from Johnson in exchange for her participation in the arrangement. Hansen later identified Johnson from a three-person lineup.

In the following months, Fitzgerald stopped sending packages to Hansen's address. But Inspector Brandt and Officer Davis continued to monitor mailings from the Orange, California, area to the Sioux City area. Soon, Inspector Brandt noticed a "money mailing" sent to Fitzgerald's address from a new location in Sioux City,

---

Honorable Kelly K.E. Mahoney, Chief United States Magistrate Judge for the Northern District of Iowa.

and he suspected that the "drug mailings were continuing." On August 2, 2019, Inspector Brandt flagged "two sets" of suspicious packages he believed were mailed by Fitzgerald under a fictitious name to an address in Sioux City. The first set had already been delivered, but two other packages were still "in the mail stream" and on their way to Sioux City. Officer Davis and Drug Enforcement Administration agents surveilled the intended destination of these packages for about five hours but were unable to identify the woman who picked up the packages or where she took them.

On August 27, 2019, Inspector Brandt flagged another suspicious package mailed from Fitzgerald to Sioux City. Agents intercepted the package, which contained 4.6 pounds of methamphetamine. Agents repackaged the drugs and planned a controlled delivery. The next day, Inspector Brandt, dressed as a postal worker, delivered the package to the listed address, where he observed the same unidentified woman from the August 2 delivery retrieve the package and take it into her home. Agents identified the woman as Desiree Fredrickson and executed a search warrant at her residence. During the search, agents saw methamphetamine next to the opened package, and discovered they had missed a compartment inside the package that contained five ounces of cocaine. Fredrickson and her then-boyfriend, Shawn Hofer,[2] were detained and interviewed by Inspector Brandt and Officer Davis.

In separate post-Miranda interviews, Hofer and Fredrickson admitted to retrieving these packages for a black man they nicknamed "Barbecue Dude" or "Arkansas." Hofer said that Barbecue Dude would inform Hofer when a package was on its way from California, and once Hofer and Fredrickson retrieved the package, they would call Barbecue Dude and take it over to his apartment. In exchange, Barbecue Dude would advance one pound of methamphetamine to Hofer. Hofer said that, prior to August 28, he and Fredrickson had received two other

---

[2]Fredrickson and Hofer married in September 2019, and Fredrickson changed her name to Desiree Hofer. For clarity, we will refer to her as Fredrickson.

packages with drugs for Barbecue Dude. Hofer identified Johnson as Barbecue Dude from a two-person lineup, while Fredrickson identified Johnson as the man from a single-person lineup. Hofer and Fredrickson agreed to cooperate with officers in a controlled delivery of the package to Johnson's apartment.

Officers decided to conduct the controlled delivery to Johnson that same day. They repackaged the drugs, and established surveillance around Johnson's apartment. Relying on the information Hofer and Fredrickson provided, Officer Davis also prepared an affidavit that was used to obtain an anticipatory search warrant for Johnson's apartment. That evening, Hofer was equipped with an audio recording device, and consistent with his and Fredrickson's previous practice, they called Johnson and told him they were on their way to his apartment with his "shoes," their code word for drugs. When Hofer and Fredrickson arrived at Johnson's apartment, Johnson welcomed them inside through his patio entrance. Officers watched Hofer and Fredrickson enter with the package and heard the pair ask Johnson, using coded language, whether the product was what Johnson expected. Officers then entered Johnson's apartment and executed the search warrant. When Johnson saw the officers, he ran into a bathroom and attempted to dispose of the drugs in the toilet. Officers recovered cocaine, some of the packaged methamphetamine, and approximately $20,000 in cash from Johnson's apartment.

On August 12, 2020, a federal grand jury returned a superseding indictment charging Johnson with conspiracy to distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846, and 851 (Count 1); possession with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 851 (Count 2); and possession with intent to distribute a controlled substance and aiding and abetting the possession with intent to distribute, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 851 (Count 3). Fitzgerald, Hofer, and Fredrickson were charged as co-conspirators, and each later pleaded guilty. Johnson pleaded not guilty. Before trial, Johnson moved to suppress the evidence obtained from the search warrant executed on his apartment, which the district court denied, and the case proceeded to trial.

During the trial, Fitzgerald, Hansen, Hofer, and Fredrickson testified as cooperating witnesses for the government and described in detail Johnson's involvement in the drug distribution scheme. Their collective testimony established the following. Hansen had known Johnson for over 30 years, and in 2018, she began taking trips to California on Johnson's behalf to retrieve methamphetamine from Fitzgerald. Fitzgerald was introduced to Johnson by their mutual friend, Tammy Thorson. According to Fitzgerald, Johnson told him that Thorson and Hansen were "working for" him by "[p]icking up meth . . . and bringing it back to Iowa," and Johnson discussed the "future amounts" of methamphetamine he wanted to purchase from Fitzgerald and the cost. Hansen took at least five trips to California to acquire drugs for Johnson; she was once accompanied by Johnson, and the other times she traveled by herself or with Thorson. Johnson would call Fitzgerald to tell him that Hansen or Hansen and Thorson were on their way to California, the amount of methamphetamine he needed, and how much money the women would bring to pay for the drugs. At some point, Johnson told Fitzgerald that Hansen and Thorson would no longer transport the drugs by car and asked Fitzgerald to start sending the drugs by mail to Hansen's address in Iowa. Once Fitzgerald began mailing the methamphetamine, he would inform Johnson of the package's tracking number, and Johnson would send Hansen a text message to let her know when the package would arrive at her residence.

According to Hofer, his relationship with Johnson began with transactions involving personal-use amounts of methamphetamine, and it developed when Johnson began to advance, or "front," Hofer four to five ounces of methamphetamine "[e]very week or two" for about three months. After Johnson told Hofer and Fredrickson about the package of methamphetamine that was intercepted at Hansen's home, the three discussed an "idea" to start having the packages sent to the address of Hofer and Fredrickson's unsuspecting neighbor. Johnson then directed Fitzgerald to start mailing his packages to this new location in Sioux City. Johnson would tell Hofer when a package was on its way, and once it arrived, Hofer and Fredrickson would drive to Johnson's apartment the same night to deliver the drugs.

At the close of the government's evidence, Johnson moved for judgment of acquittal, which was denied. The jury ultimately convicted Johnson on Counts 1 and 2 and acquitted him on Count 3. The district court denied Johnson's post-verdict motion for judgment of acquittal or a new trial.

At sentencing, the presentence investigation report (PSR) recommended a base offense level of 38, resulting in an advisory Guidelines range of 360 months to life. The district court overruled Johnson's objection to the drug quantity calculation but granted a downward variance and sentenced Johnson to 264 months of imprisonment, to be followed by 10 years of supervised release. Johnson now appeals, and we address each argument in turn.

II.

A.

We begin with Johnson's assertion that the district court erred in denying his motion to suppress the evidence seized from his residence.[3] On appeal from the denial of a motion to suppress, we review the district court's findings of fact for clear error and its legal conclusions de novo. United States v. Farnell, 701 F.3d 256, 260 (8th Cir. 2012). We affirm unless the denial of the motion "is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and definite conviction that a mistake has

_____

[3]The government contends that Johnson's suppression motion was untimely. But Johnson's motion to suppress was filed within the deadline set by the magistrate judge's amended scheduling order. And though the government argues the magistrate judge improperly extended pre-trial deadlines, the government failed to timely challenge the court's scheduling order, see Fed. R. Crim. P. 59(a), and we discern no error or abuse of discretion from our review of the record. See United States v. Smith, 422 F.3d 715, 725 (8th Cir. 2005) (explaining that a district court has "broad discretion to control the scheduling of events in matters on its docket," which includes "the ability to make decisions regarding the deadline for pretrial filings, and whether to grant a motion to continue that deadline" (citations omitted)).

been made." Id. at 260–61 (quoting United States v. Rodriguez-Hernandez, 353 F.3d 632, 635 (8th Cir. 2003)).

1.

First, Johnson argues that the affidavit supporting the warrant application to search his residence omitted material information. See Franks v. Delaware, 438 U.S. 154, 171–72 (1978). The Fourth Amendment requires probable cause for the issuance of a search warrant. U.S. Const. amend. IV. However, a search warrant may be invalid "if the issuing judge's probable cause determination was based on an affidavit containing false or omitted statements made knowingly and intentionally or with reckless disregard for the truth." United States v. Conant, 799 F.3d 1195, 1199 (8th Cir. 2015) (quoting United States v. Reinholz, 245 F.3d 765, 774 (8th Cir. 2001)).

To prevail on a Franks challenge[4] to a warrant affidavit for omissions of fact, Johnson must show: "(1) that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading; and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." Id. at 1200 (quoting Reinholz, 245 F.3d at 774). "Reckless disregard requires showing that the officer 'must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information.'" United States v. Reed, 921 F.3d 751, 756 (8th Cir. 2019) (quoting

---

[4]Johnson contends that the district court abused its discretion by failing to hold a Franks hearing. But the magistrate judge in her report and recommendations noted that she "granted Johnson a Franks hearing." At this hearing, the magistrate judge heard testimony from Officer Davis, the affiant, as well as Inspector Brandt, and Woodbury County, Iowa, Sheriff's Deputy Todd Peterson. See Conant, 799 F.3d at 1199 (recognizing that "a Franks hearing was, in effect, conducted when the officers involved were questioned at the evidentiary hearing, and the district court treated the evidentiary hearing as a Franks hearing" (quotations omitted)). To the extent Johnson argues he needed another Franks hearing, he fails to show what additional information would be elicited at such a hearing.

Conant, 799 F.3d at 1200); see also United States v. McIntyre, 646 F.3d 1107, 1114 (8th Cir. 2011) ("Recklessness . . . may be inferred from the fact of omission of information from an affidavit when the material omitted would have been clearly critical to the finding of probable cause." (cleaned up)).

Johnson asserts that Officer Davis's affidavit omitted important information about Hofer and Fredrickson, including their romantic relationship, Hofer's outsized role as the source of the information that the two provided in their interviews, and the suggestive lineup and circumstances that led to Fredrickson's identification of Johnson. Johnson contends the affidavit also should have included the fact that law enforcement provided Hofer and Fredrickson money to give Johnson during the controlled delivery, which "increase[d] the odds" that Johnson would accept the package, and the fact that surveillance in connection with the August 2, 2019, packages showed no involvement by Johnson.

The magistrate judge acknowledged that the warrant affidavit failed to include "a lot of information relevant to probable cause" and was "misleading," but she found that there was no evidence that Officer Davis "acted intentionally or with reckless disregard for the truth in drafting the affidavit." We see no error in this conclusion. As the court observed, law enforcement faced a "time crunch" to obtain the search warrant before Hofer and Fredrickson delivered the package at their regularly scheduled time. Thus, in his rush, Officer Davis "left out some details" from the affidavit—"including facts bolstering the existence of probable cause"— and "summarized others." The magistrate judge, after hearing testimony from Officer Davis, concluded that his conduct in drafting the affidavit amounted to negligence. But to prevail here, Johnson "must show more than negligence or an innocent mistake." United States v. Finley, 612 F.3d 998, 1002 (8th Cir. 2010). And we agree with the district court that Officer Davis did not act recklessly in his efforts to obtain a search warrant, despite the time pressure. The record does not indicate that Officer Davis entertained serious doubts about, or had obvious reasons to question, the accuracy of his statements. Therefore, Johnson is not entitled to suppression under Franks.

2.

Next, Johnson argues that the warrant application did not establish probable cause to search his residence. "Probable cause exists when the affidavit sets forth sufficient facts to lead a prudent person to believe that there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Warford, 439 F.3d 836, 841 (8th Cir. 2006) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

The information Officer Davis included in the affidavit about Johnson came from Hofer and Fredrickson. Yet, according to Johnson, the warrant application provided "no information suggesting that" Officer Davis "corroborated any aspect of Fredrickson and Hofer's accusations against Johnson." And he argues the warrant lacked "any information from which a reviewing magistrate [judge] could reasonably assess Fredrickson or Hofer's truthfulness, credibility, reliability, or motivations."

Even if we assume that the warrant application was insufficient to establish probable cause, we conclude that the good-faith exception to the exclusionary rule applies in this case. "Under the Leon good-faith exception, disputed evidence will be admitted if it was objectively reasonable for the officer executing a search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant." United States v. Hudspeth, 525 F.3d 667, 676 (8th Cir. 2008) (quoting United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007)); see United States v. Leon, 468 U.S. 897, 922 (1984). In determining whether the officer relied in good faith on the validity of a warrant, we consider the totality of the circumstances, including any information known to the officer but not included in the search warrant application. See Grant, 490 F.3d at 632.

Considering the information known to law enforcement at the time the officers searched Johnson's home, it was objectively reasonable for them to believe that the search was supported by probable cause. See, e.g., United States v. Thompson, 976

F.3d 815, 822 (8th Cir. 2020) (concluding that information known by an officer but not included in a search warrant application nonetheless "bolstered" the officer's belief in the validity of the warrant). Officers had conducted a months long investigation into a methamphetamine-by-mail scheme, and after they intercepted one package containing a distribution-level quantity of methamphetamine, a source—Hansen—identified Johnson as a key suspect. Hansen said that she delivered packages to Johnson at his apartment in exchange for money and drugs. When officers later intercepted a similar package, the investigation further led them to Hofer and Fredrickson, who separately gave statements against their penal interest and provided specific details about delivering the packages to a man they identified as Johnson. Officers independently verified Johnson's address using public sources, and this information was consistent with the information provided by Hansen, Hofer, and Fredrickson. Based on these additional facts, along with the information included in the warrant affidavit, the officers' good-faith reliance on the search warrant for Johnson's home was objectively reasonable.

3.

Finally, Johnson argues that officers impermissibly executed the anticipatory warrant at his apartment. "An anticipatory warrant is a warrant based upon an affidavit showing probable cause that at some future time (but not presently) certain evidence of crime will be located at a specified place." United States v. Grubbs, 547 U.S. 90, 94 (2006) (cleaned up and citation omitted). Anticipatory warrants often condition their execution on an event called a "triggering condition." Id. The "[o]ccurrence of the triggering condition establishes the requisite connection between 'the item described in the warrant' and 'the searched location.'" United States v. Brown, 929 F.3d 1030, 1038 (8th Cir. 2019) (quoting Grubbs, 547 U.S. at 94).

Johnson contends that based on the language of the warrant affidavit, the warrant could be executed only after delivery of the package "in accordance with [Hofer and Fredrickson's] previous practice." But this was not a condition specified

in the warrant.  By its express terms, the warrant's triggering condition was defined only as "[t]he delivery of the subject package of methamphetamine" to Johnson's apartment.  The warrant contained no condition regarding the manner of the package's delivery, nor did it incorporate by reference the "previous practice" described in the affidavit.

Johnson also asserts that the officers executed the warrant "contrary to its very terms."  According to Johnson, a "triggering condition" for the warrant was delivery to "3425 Fieldcrest Drive."  But Johnson lived, and the warrant was executed, at "4325 Fieldcrest Drive."  True, the search warrant's condition precedent included the wrong street number for Johnson's residence.  However, "[m]ere technical errors . . . are not enough to invalidate a search warrant." United States v. Valentine, 984 F.2d 906, 909 (8th Cir. 1993).  And we have held that "an incorrect street address of the place to be searched is not necessarily fatal" to a warrant's validity.  United States v. Thurman, 625 F.3d 1053, 1057 (8th Cir. 2010) (quoting United States v. Ridinger, 805 F.2d 818, 819 (8th Cir. 1986)).  The relevant inquiry is whether the warrant "described the place to be searched 'with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort,' and that there was no 'reasonable probability that another premise[s] might be mistakenly searched.'" Id. (quoting United States v. Gitcho, 601 F.2d 369, 371 (8th Cir. 1979)).

The warrant here expressly authorized the search of Johnson's apartment at "4325 Fieldcrest Drive Apartment 1D," and described the building to be searched as "a three-story grey brick and siding apartment building with a secured entrance." See, e.g., Valentine, 984 F.2d at 909 (finding a warrant sufficient though it authorized a search at "3048 Thomas" instead of "3050 Thomas," where it correctly described the place to be searched as "a 2 story, single family brick dwelling with an alluminum [sic] storm door and sits back from the street . . . 1 door east of 3050 Thomas").  And because officers had conducted surveillance of Johnson's apartment before the warrant was executed, they had personal knowledge of its location; and the premises that they intended to search were, in fact, searched.  See Gitcho, 601

-11-

F.2d at 372 (deeming a search lawful, despite the warrant containing an erroneous address, in part because "the agents executing the warrant personally knew which premises were intended to be searched, and those premises were under constant surveillance while the warrant was obtained"). Because the description of Johnson's residence was sufficiently particular and there was no reasonable probability of a mistaken search, the typographical error in the warrant's condition precedent does not require suppressing the evidence seized.

B.

1.

We next address Johnson's argument that the district court erred in denying his motion for a judgment of acquittal. We review a district court's denial of a motion for judgment of acquittal de novo. United States v. Augustine, 663 F.3d 367, 373 (8th Cir. 2011). "In reviewing the sufficiency of the evidence to support a guilty verdict, we look at the evidence in the light most favorable to the verdict and accept as established all reasonable inferences supporting the verdict." Id. (quoting United States v. Campa-Fabela, 210 F.3d 837, 839 (8th Cir. 2000)).

To convict Johnson of conspiracy to distribute methamphetamine as charged in Count 1, the government had to prove (1) "a conspiracy to distribute methamphetamine existed"; (2) Johnson "knew about the conspiracy"; and (3) Johnson "knowingly became a part of the conspiracy." United States v. Lewis, 976 F.3d 787, 794 (8th Cir. 2020). "The conspiracy's existence may be proved by direct or circumstantial evidence." United States v. Milk, 66 F.4th 1121, 1135 (8th Cir. 2023) (quoting United States v. Cain, 487 F.3d 1108, 1111 (8th Cir. 2007)).

On appeal, Johnson principally challenges the credibility of the cooperating witnesses, alleging that "a reasonable jury should have not discounted the very realistic possibility that" Hansen, Fitzgerald, Fredrickson, and Hofer sought to "scapegoat" Johnson and "minimize their own culpability." "[B]ut we defer to the

jury's assessment of witness credibility and will not reweigh the evidence or the credibility of the government's witnesses." Milk, 66 F.4th at 1136; see United States v. Hodge, 594 F.3d 614, 618 (8th Cir. 2010) ("Only when credibility determinations are internally inconsistent, based upon incoherent or implausible testimony, or directly at odds with objective evidence is a more searching review warranted."). The evidence demonstrated that Johnson enlisted the help of Hansen, Fredrickson, and Hofer to acquire methamphetamine by car or by mail from Fitzgerald in California, and that it was Johnson who coordinated the transport, shipment, or delivery of the drugs to Iowa. That Johnson provided Hansen, Fredrickson, and Hofer with drugs or money in exchange for their assistance shows both that there was an agreement or understanding between Johnson and these co-conspirators, and that Johnson knew about and knowingly became a part of the agreement or understanding. Accordingly, sufficient evidence supports Johnson's conviction on Count 1.

To convict Johnson on Count 2, the government had to prove that Johnson knowingly possessed methamphetamine with the intent to distribute it. See United States v. Vore, 743 F.3d 1175, 1180 (8th Cir. 2014). Actual or constructive possession is sufficient to satisfy the element of knowing possession. See United States v. Corrales-Portillo, 779 F.3d 823, 832 (8th Cir. 2015). The evidence at trial established that Johnson took physical possession of the methamphetamine delivered to his apartment by Hofer and Fredrickson, and officers recovered roughly 31 grams of methamphetamine and 15 grams of actual methamphetamine from Johnson's bathroom floor. The quantity of the drugs as well as the amount of cash recovered from Johnson's apartment were sufficient to allow the jury to infer Johnson's intent to distribute. See United States v. Knox, 888 F.2d 585, 588 (8th Cir. 1989) (explaining that "intent to distribute, may be inferred from circumstantial evidence such as a large sum of cash, and a quantity of a controlled substance," such that "$5000 cash and over 14 grams of cocaine" was sufficient to infer intent); United States v. Thompson, 686 F.3d 575, 585 (8th Cir. 2012) ("Thompson's possession of more than 33 grams and his unexplained cash resources support the jury's inference that he possessed the cocaine with the intent to distribute it."). A

rational jury could have found Johnson guilty of this charge beyond a reasonable doubt.

2.

Johnson argues that the district court also erred in denying his motion for a new trial based on "newly discovered evidence," an error he asserts stems from the government's failure to disclose Brady[5] evidence. See Fed. R. Crim. P. 33(a) (permitting the district court to grant a new trial "if the interest of justice so requires"). We review the denial of a motion for a new trial for abuse of discretion. United States v. Delgrosso, 852 F.3d 821, 827 (8th Cir. 2017).

Brady requires prosecutors to disclose to the defense "all material evidence favorable to the accused, including impeachment and exculpatory evidence." United States v. Robinson, 809 F.3d 991, 996 (8th Cir. 2016). To prevail on this claim, Johnson must establish that "(1) the government suppressed evidence; (2) the evidence was favorable to him; and (3) the evidence was material to the outcome of the trial." United States v. Garrett, 898 F.3d 811, 816 (8th Cir. 2018); see also United States v. Dittrich, 204 F.3d 819, 822 (8th Cir. 2000). "For evidence to be material, there must be a 'reasonable probability that had it been disclosed, the result of the proceeding would have been different.'" Garrett, 898 F.3d at 816 (quoting Robinson, 809 F.3d at 996).

Johnson alleges the government failed to disclose evidence from a separate pending criminal matter, United States v. Gentry, which he contends involved the "existence of a black methamphetamine dealer nicknamed 'Arkansas'" who had "similar characteristics to Johnson, [and] was sentenced the week after Johnson's trial for a methamphetamine offense." The district court reviewed relevant documents from Gentry and found that this evidence was not material. We agree.

---

[5]Brady v. Maryland, 373 U.S. 83 (1963).

First, the evidence at trial showed that Johnson did not go by the nickname "Arkansas." Rather, Hofer and Fredrickson referred to Johnson as "Arkansas" based on the area code of his personal phone number, and they did so only between themselves, not to Johnson "in person." Second, while Johnson and Gentry "are both black men, they have significantly different physical traits." Law enforcement records show that Johnson is about six inches taller and 30 years older than Gentry. Finally, as the district court recognized, "Gentry's case involved a conspiracy to distribute methamphetamine in the Fort Dodge area[,] utilized a different scheme," and had "no overlapping participants with Johnson's conspiracy." While Johnson maintains that a retrial is warranted because the Gentry evidence bears on "the reliability of Fredrickson and Hofer's identification of Johnson," the government's case was not dependent on their identification testimony, and it had identified Johnson as a suspect months before Hofer and Fredrickson's involvement. In sum, there was no abuse of discretion in denying Johnson's motion for a new trial because there was no reasonable probability that the result of the proceeding would have been different had the Gentry evidence been produced.

C.

Finally, we address Johnson's argument that the district court erred in its calculation of the drug quantities attributable to him for purposes of sentencing. "The government bears the burden of proving drug quantity by a preponderance of the evidence." United States v. Sainz Navarrete, 955 F.3d 713, 720 (8th Cir. 2020) (quoting United States v. Plancarte-Vazquez, 450 F.3d 848, 852 (8th Cir. 2006)). "When calculating drug quantity, 'the sentencing court may consider all transactions known or reasonably foreseeable to the defendant that were made in furtherance of the conspiracy.'" Id. (quoting Plancarte-Vazquez, 450 F.3d at 852). The court's approximation may be "based on imprecise evidence so long as the record reflects a basis for the court's decision." United States v. Yellow Horse, 774 F.3d 493, 497 (8th Cir. 2014) (quoting United States v. Roach, 164 F.3d 403, 413–14 (8th Cir. 1998)). We review the district court's drug quantity determination for clear error, and we will reverse "only if the entire record definitively and firmly convinces us

-15-

that a mistake has been made." United States v. Shaw, 965 F.3d 921, 926 (8th Cir. 2020) (quoting United States v. Quintana, 340 F.3d 700, 702 (8th Cir. 2003)).

First, Johnson asserts that the district court improperly relied on acquitted conduct to calculate his base offense level. The jury acquitted Johnson on Count 3, which charged him with possession-with-intent and aiding-and-abetting based on the methamphetamine seized from Hansen on June 6, 2019. Yet the district court included the full amount of methamphetamine seized on June 6 in its drug quantity calculation. As Johnson acknowledges, however, under our existing precedent, "an acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." United States v. Ruelas-Carbajal, 933 F.3d 928, 930 (8th Cir. 2019) (cleaned up); United States v. Crippen, 627 F.3d 1056, 1066 (8th Cir. 2010) ("We have rejected the contention that counting acquitted conduct as relevant conduct violates a defendant's due process rights."). The government presented sufficient evidence at trial to permit the district court to find by a preponderance of the evidence that Johnson was responsible for this drug quantity. Hansen testified that Johnson was the intended recipient of the intercepted June 6 package, and she described her routine: retrieve a package when it arrived at her residence, take it to Johnson's apartment, and mail money she got from Johnson to Fitzgerald to cover the drug sale. Whatever the merits of Johnson's argument regarding the use of acquitted conduct at sentencing, we are bound by precedent to conclude that the district court did not err when it considered this conduct in determining Johnson's base offense level.

Johnson also argues that the district court relied on "unreliable evidence" by considering testimony from Hansen, Fitzgerald, Hofer, and Fredrickson in calculating the drug quantity attributable to him. But the district court was entitled to rely on the trial testimony of the co-conspirators in determining the drug quantity amount. See Plancarte-Vazquez, 450 F.3d at 852 ("It is well-established that the testimony of co-conspirators may be sufficiently reliable evidence upon which the court may base its drug quantity calculation for sentencing purposes."). And the

testimony of the co-conspirators was corroborated in part by USPS records showing mailings between Fitzgerald and Hansen, Hofer, and Fredrickson, as well as law enforcement surveillance or interdiction of several packages containing or reasonably suspected to contain large quantities of methamphetamine. We therefore see no clear error in the district court's drug-quantity calculation.

## III.

Based on the foregoing, we affirm the judgment of the district court.[6]

_____

---

[6]We grant Johnson's pro se motion to file a supplemental brief. We discern no plain error in the district court's failure to grant a mistrial based on the admission of alleged hearsay testimony, see Fed. R. Evid. 801(d)(2)(E) (noting that a statement is not hearsay if offered against an opposing party and "made by the party's coconspirator during and in furtherance of the conspiracy").