# United States Court of Appeals

### For the Eighth Circuit

_____

No. 23-3118

_____

United States of America

*Plaintiff - Appellee*

v.

Roy O. Franklin, Jr., also known as Roy

*Defendant - Appellant*

_____

No. 23-3123

_____

United States of America

*Plaintiff - Appellee*

v.

Ladele D. Smith, also known as Dellio, also known as Dog

*Defendant – Appellant*

_____

No. 23-3228
_____

United States of America

*Plaintiff - Appellee*

v.

Gary O. Toombs

*Defendant - Appellant*
_____

No. 23-3280
_____

United States of America

*Plaintiff - Appellee*

v.

David J. Duncan, IV, also known as Deej, also known as DJ

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City
_____

Submitted: January 15, 2025
Filed: June 1, 2026
_____

Before GRASZ, STRAS, and KOBES, Circuit Judges.
_____

KOBES, Circuit Judge.

Roy Franklin Jr., Ladele Smith, Gary Toombs, and David Duncan IV were members of a sprawling drug-trafficking conspiracy in Kansas City, Missouri that lasted from 2011 to 2019. A jury found them guilty of various drug, firearm, and money-laundering offenses. We affirm their convictions and sentences.

## I. Background

Smith and Duncan were close friends who formed a music group called 246, named after the Kansas City streets where they grew up. Smith was the star, and he rapped about guns, violence, selling drugs, and making money. Social media posts and music videos show Smith, Duncan, and Franklin with guns, luxury goods, and large amounts of cash. According to the group's sound engineer, their music was meant to be "catchy, flashy, street," and the lyrics suggested "a persona of a certain lifestyle" that was meant to sell albums. They hung out and stored guns at a house Toombs rented on Kensington Avenue, where various drug-trafficking activity took place.

One evening in September 2019, Franklin went to the house and loaded guns into a black Jeep Cherokee. Franklin and Smith then sped to the intersection of 35th and Woodland, where Duncan had a store. Franklin drove, while Smith shot at two men outside the store. They turned around, drove by again, and fired more shots. The men returned fire. Franklin and Smith returned to the Kensington Avenue house less than 15 minutes after they had left. Franklin then regaled a cooperating individual (CI) with the story, explaining that Duncan called and said that two men outside the store were going to kill him. The CI took photos of the Jeep's shattered back windshield and damaged passenger-side mirror.

Before trial, the district court[1] denied Franklin's motion to suppress evidence from social media searches and wiretaps. It also denied motions in limine to exclude Smith's rap lyrics and evidence about the defendants' affiliation with the 246 group. The district court decided to admit the cooperating individual's testimony about the drive-by shooting.

During the three-week trial, the Government argued that the 246 group was also a drug-trafficking organization. Smith, Duncan, Franklin, Toombs, and several others sold drugs, including marijuana, oxycodone, cocaine, and heroin. The Government presented evidence of controlled buys, photos and videos from police surveillance, social media posts and music videos by the defendants, messages among 246 gang members, and texts and recorded phone calls among the members and with others. A search of the Kensington Avenue house revealed drugs and paraphernalia, including 295 grams of heroin, seven cell phones, five guns, a tactical vest labeled "246 Brothership," ammunition, and other evidence of drug-cutting and distribution. Financial records revealed that Duncan and Smith deposited substantial amounts of cash into their bank accounts and spent lavishly, despite having no reported income.

The district court refused Franklin's request to instruct the jury on entrapment and Toombs's request for a buyer-seller instruction. The jury convicted the defendants on the counts discussed below.

## II. Discussion

### A. Roy Franklin Jr.

Franklin was convicted of nine offenses: conspiracy to distribute less than 500 grams of cocaine, some amount of oxycodone, and a mixture containing marijuana,

---

[1]The Honorable David Gregory Kays, United States District Judge for the Western District of Missouri.

-4-

21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 846; conspiracy to possess firearms in furtherance of a drug-trafficking crime, 18 U.S.C. § 924(o); drive-by shooting, 18 U.S.C. § 36; discharging a firearm in furtherance of a crime of violence, 18 U.S.C. § 924(c)(1)(A)(iii); maintaining a drug-involved premises, 21 U.S.C. § 856(a)(1) and (b); two counts of distribution of marijuana, 21 U.S.C. § 841(a)(1) and (b)(1)(D); and two counts of distribution of marijuana near a school, 21 U.S.C. §§ 841(a)(1) and 860. He was sentenced to 360 months in prison.

### 1. Motion to Suppress Evidence of Instagram Posts and Messages

Franklin argues that the district court erred in denying his motion to suppress. He claims that the search warrant for his Instagram account was not supported by probable cause. *See* U.S. Const. amend. IV ("no Warrants shall issue, but upon probable cause"). "Probable cause exists when the totality of circumstances shows 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Ivey*, 91 F.4th 915, 917 (8th Cir. 2024) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Our review is limited to whether the issuing judge had a "substantial basis" for finding probable cause. *Id.* (citing *Gates*, 462 U.S. at 238–39).

FBI Special Agent Douglas McKelway's warrant application and affidavit provided that "substantial basis." He stated that confidential sources, the Kansas City Police Department, and the FBI had identified Franklin as a member of the 246 organization. He attached information discovered in an earlier search of Smith's Instagram account. In an April 2018 group chat among 246 members, the group discussed disrespect by someone they thought was an ally and "handling shit." Franklin wrote "Hit em up GANG." Franklin later wrote "Gtta start Droppin shit them pull ups be a waste of time," which McKelway interpreted as using a drop location for drugs instead of having the dealer meet the buyer. And in a conversation between the same 246 members in May, they seemed to discuss killing a rival gang member, although Franklin did not say anything.

-5-

Franklin's affiliation with the group and his participation in group chats discussing violence against rivals and drug distribution provided a basis for the issuing judge to find that evidence of a drug-trafficking conspiracy would probably be found in Franklin's Instagram records. Franklin argues that his two comments were not enough, but the judge properly considered the full transcript of the group chat. *Cf. United States v. Lukassen*, 103 F.4th 1325, 1329 (8th Cir. 2024) ("Whether an officer has established probable cause to search depends on the totality of the circumstances."). And Franklin's argument that his comments "could mean anything" is unpersuasive when Agent McKelway explained the context and what they meant to drug dealers. *See United States v. Mims*, 122 F.4th 1021, 1031 (8th Cir. 2024) ("Conduct that appears innocuous . . . may be significant to an officer with training and experience in 'the practices of drug smugglers and the methods used to avoid detection.'" (citation omitted)).

Franklin also argues that the warrant failed to "particularly describ[e] the place to be searched," U.S. Const. amend. IV. The Fourth Amendment's particularity requirement prevents "a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971); *see Payton v. New York*, 445 U.S. 573, 585 (1980). "In assessing whether a warrant is sufficiently particular, we consider the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case." *Ivey*, 91 F.4th at 918.

The warrant required Instagram to disclose information and activity related to Franklin's account. *See* 18 U.S.C. § 2703 (required disclosure of customer communications or records). It then authorized officers to seize evidence related to certain drug-distribution and money-laundering offenses from January 2017 to September 2018. *See* Fed. R. Crim. P. 41(e)(2)(B); *Lindell v. United States*, 82 F.4th 614, 621–22 (8th Cir. 2023) (explaining that Rule 41(e)(2)(B) "provides for a two-step process to search electronic items"). That evidence included communications and photographs about drug trafficking and manufacturing, gang involvement, firearms, homicides, violence, recruitment of new members, strategies to avoid

apprehension, and destruction of evidence, as well as records identifying who created, used, or communicated with Franklin's Instagram account.

The warrant was sufficiently particular. It identified the Instagram account to be searched, the information to be seized, and the time frame for the data. This is not meaningfully different from the warrant we upheld in *United States v. Ivey*, which authorized the search of a cell phone "for evidence related to firearms, ammunition, and possession and ownership of the seized firearm." 91 F.4th at 917. That Franklin's Instagram account likely contained information unrelated to the criminal investigation "did not transform the warrant into an impermissible general warrant." *See id.* at 918 ("Evidence of the offense could have been found anywhere in the phone, and 'a warrant need not be more specific than knowledge allows.'" (citation omitted)); *Lindell*, 82 F.4th at 620 ("While the phone very likely also contains a plethora of information unrelated to the government's investigation, . . . this fact does not transform the warrant into a general warrant."). And where the affidavit included information about an ongoing drug conspiracy with specific incriminating conversations in April and May 2018, the request for data from January 2017 to September 2018 was not overbroad.[2] *See United States v. Zelaya-Veliz*, 94 F.4th 321, 340 (4th Cir. 2024) (while a "total lack of a time period in a social media warrant raises a problem," a two-year period of disclosure was sufficiently particular because the "extensive nature of the conspiracy being investigated . . . meant that less temporal specificity was required" (cleaned up)).

2. Motion to Suppress Wire and Electronic Communications

The Government received authorization to tap two of Franklin's phones, "target telephone 6" (TT6) and "target telephone 9" (TT9). The issuing judge found that the application met the requirements of 18 U.S.C. § 2518(3): there was probable cause to believe that Franklin was committing drug-trafficking and firearm offenses;

---

[2]Facebook (then Instagram's parent corporation) produced data from September 2017 to September 2018.

he had used the phones in connection with those offenses; normal investigative procedures had failed, would fail, or were too dangerous; and interceptions would likely reveal communications about drugs and guns.

Franklin argues that the district court erred in denying his motion to suppress because the wiretap application failed to establish probable cause that he was engaged in criminal activity or that a wiretap would reveal evidence of criminal activity. "The probable cause requirement in § 2518(3) is the same as the Fourth Amendment's probable cause requirement," and our review is once again "limited to determining whether the judge had a 'substantial basis' for finding probable cause." *Mims*, 122 F.4th at 1030 (citation omitted).

Agent McKelway's affidavits establish a fair probability that wiretaps on TT6 and TT9 would reveal evidence of drug-trafficking and firearm offenses. They included information from a confidential source who told law enforcement Franklin was involved in drug sales, but mainly worked as an enforcer for the 246. TT6 was linked to Franklin's Instagram account, and the affidavit included direct-message conversations with previous and potential buyers. Franklin gave TT6's number to buyers and others, while using coded language to discuss drug sales and possibly a firearm purchase. Previous wiretaps intercepted calls with Franklin using TT6 to sell high-grade marijuana, Percocet, and codeine cough syrup and using TT9 to plan a robbery and buy "pills."

Franklin argues that the evidence from his Instagram account was illegally seized and should not be used to establish probable cause for the wiretaps, but we have previously decided that it was legal. He argues that Agent McKelway's interpretations of the "vaguely worded conversations" could not establish probable cause, but we have already explained why a judge could credit those interpretations. *See Mims*, 122 F.4th at 1031 (weight given to agent's interpretation of the "allegedly innocuous conversations" as discussing the purchase and sale of drugs). And even if we were to excise the information given by the confidential source, which Franklin argues is unreliable, the application would still establish a substantial basis for

finding that the TT6 and TT9 wiretaps would likely reveal evidence of criminal activity. *See O'Neil v. United States*, 966 F.3d 764 (8th Cir. 2020) (considering whether the affidavit was sufficient to establish probable cause after removing incorrect information).

Franklin also claims that the affidavit failed to establish necessity and that officers should have been required to use additional traditional investigative efforts before a wiretap. Section 2518(3)(c)'s "necessity requirement is satisfied when law enforcement establish that 'conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each coconspirator.'" *Mims*, 122 F.4th at 1029 (cleaned up). The requirement "prevents the government from routinely using wiretaps as the initial step in an investigation," but officers need not "exhaust all possible techniques before applying for a wiretap." *United States v. Perez-Trevino*, 891 F.3d 359, 370 (8th Cir. 2018) (cleaned up).

The district court did not clearly err in finding that the wiretaps were necessary. *See id.* (standard of review). Agent McKelway explained that officers had conducted surveillance on Franklin and others associated with the 246 organization but had limited success because the men used a variety of vehicles, were aware of surveillance, and used counter-surveillance to elude officers. Officers also used GPS technology, cell site locations, and covert surveillance cameras to monitor movement, but these techniques could produce only limited evidence. Confidential sources provided some historical and organizational information, but generally did not complete controlled buys or record conversations, because they lacked access or it was too dangerous. Associates typically refused to talk after their arrests. And although a financial investigation was ongoing, nothing revealed a large-scale movement of money. Franklin argues that officers should have done more, but officers are not required to use wiretaps only as a "last resort." *Mims*, 122 F.4th at 1029 (citation omitted). He also claims that Agent McKelway's claims of necessity were not sufficiently specific, but "[b]oilerplate assertions of necessity are not fatal to the affidavit" because "[d]rug conspiracies contain common elements that render some conventional investigatory techniques ineffective in each case." *Id.*

-9-

### 3. Entrapment Instruction on Conspiracy to Distribute Cocaine

At trial, Franklin's attorney elicited evidence that government agents gave the CI the idea to purchase cocaine; that Franklin had not previously sold the CI cocaine, but said it "ain't shit to get"; that the CI paid Franklin $200 as a finder's fee to get cocaine; and that Franklin didn't usually deal cocaine but served as a middleman to make some money. Based on that testimony, Franklin requested an entrapment instruction on cocaine. The Government objected and proffered that it had video evidence of Franklin telling a story about how he and a co-defendant "bust[ed] serves of cocaine." The Government had agreed to not introduce the video, but—if the court allowed the entrapment instruction—it would present it to show that Franklin was predisposed to selling cocaine. The district court ruled that Franklin was not entitled to the instruction, and the Government did not introduce the video.

We review *de novo* the denial of an entrapment instruction. *United States v. John*, 27 F.4th 644, 649 (8th Cir. 2022). "[A] valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Mathews v. United States*, 485 U.S. 58, 63 (1988). "If the defendant exhibits any predisposition to engage in the criminal conduct, the district court need not instruct the jury on entrapment." *United States v. Berg*, 178 F.3d 976, 980 (8th Cir. 1999); *United States v. Neal*, 990 F.2d 355, 358 (8th Cir. 1993) ("[I]f predisposition exists, then there is not sufficient evidence from which a reasonable jury could find entrapment.").

Even if we were to agree with Franklin that the Government induced him to sell cocaine, he has not shown a lack of predisposition. "Predisposition . . . focuses upon whether the defendant was an 'unwary innocent' or, instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." *Mathews*, 485 U.S. at 63 (citations omitted). Franklin was not an "unwary innocent." He was a longtime member of a drug conspiracy that involved the sale of cocaine, even if he usually sold marijuana and sometimes sold codeine and oxycodone. Cocaine may not have been Franklin's "forte," but the CI testified that Franklin

-10-

"always talked about it. I mean, like, it ain't nothing to get." *See Neal*, 990 F.2d at 358 (defendant predisposed when he knew people who could supply cocaine, called a potential supplier, and intended to make a profit off a drug deal); *Berg*, 178 F.3d at 980 ("His never having 'cooked' such a large batch [of methamphetamine] need not necessarily mean he was not predisposed to do so."). Because the evidence showed that Franklin was "predisposed—*i.e.*, willing and ready" to sell cocaine when the opportunity arose, he was not entitled to an entrapment instruction. *See United States v. Lard*, 734 F.2d 1290, 1293 (8th Cir. 1984).

## 4. Sentencing

The district court grouped together the counts of conviction, U.S.S.G. § 3D1.2(b) and (d), except for discharging a firearm in furtherance of a crime of violence, which required a mandatory consecutive sentence, 18 U.S.C. § 924(c)(1)(A)(iii). Franklin's total offense level was 32, his criminal history category was III, and the Guidelines range was 151 to 188 months in prison, plus 120 months on the firearm count. The district court imposed concurrent sentences for the grouped counts, the greatest being 151 months in prison. It varied up to 209 months on the firearm count, for a total sentence of 360 months in prison.

Franklin argues that the upward variance was substantively unreasonable because the conduct the court relied on for the variance—his criminal history, a fight while incarcerated, underlying offense conduct—was already accounted for in the Guidelines calculations. But "[a] district court is not prohibited 'from determining that the weight the Guidelines assigned to a particular factor was insufficient.'" *United States v. Donahue*, 959 F.3d 864, 867 (8th Cir. 2020) (citation omitted). The district court explained that Franklin's criminal history revealed a disregard for the safety of others. The court found that Franklin's beating of an inmate "t[old] a story [of] what we can expect from Mr. Franklin if he's let go." And most importantly, the facts underlying the firearm conviction justified the variance: Franklin committed a drive-by shooting in the early evening on a street lined with stores, homes, and a daycare. The district court found it necessary to protect the public

from further crimes by Franklin, saying "we make the community maybe just a little bit safer when we take people out who engage in drugs and guns and drive by shootings . . . like we had in this case." We have affirmed upward variances in other cases involving dangerous shootings, even when the conduct was already accounted for in the Guidelines, and we do so again here. *See, e.g.*, *United States v. Vaca*, 38 F.4th 718, 723–24 (8th Cir. 2022) (78-month upward variance where defendant shot at another person); *United States v. Godfrey*, 863 F.3d 1088, 1099–1100 (8th Cir. 2017) (83-month upward variance where the defendant shot seven bullets into a neighborhood park).

Franklin also argues that the district court's use of acquitted conduct to increase his sentence violated his Fifth and Sixth Amendment rights. But "a sentencing court may consider the conduct underlying an acquitted charge so long as that conduct has been proved by a preponderance of the evidence." *United States v. Lasley*, 832 F.3d 910, 914 (8th Cir. 2016) (citation omitted); *see United States v. Webb*, 545 F.3d 673, 677 (8th Cir. 2008) ("A preponderance of evidence standard of proof applies to judicial fact finding at sentencing, a standard that satisfies both the Fifth Amendment's guarantee to due process and the Sixth Amendment right to trial by jury."). Franklin acknowledges our precedent, but seeks to preserve his argument for further review.[3] *See United States v. Myore*, 142 F.4th 606, 613 (8th Cir. 2025) ("These constitutional issues are the subject of ongoing debate, but our panel is bound by this controlling Eighth Circuit precedent.").

## B. Ladele Smith & David Duncan

Ladele Smith was convicted of conspiracy to distribute 1 kilogram or more of heroin and some amount of mixture containing marijuana, 21 U.S.C. §§ 841(a)(1),

---

[3]After Franklin was sentenced, the U.S. Sentencing Commission amended U.S.S.G. § 1B1.3 to generally exclude acquitted conduct from relevant conduct. U.S.S.G. App. C., amend. 826 (effective Nov. 1, 2024); *see* U.S.S.G. § 1B1.11(a) ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced.").

(b)(1)(A), and 846; conspiracy to possess firearms in furtherance of drug trafficking, 18 U.S.C. § 924(o); possession of firearms in furtherance of a drug-trafficking crime, 18 U.S.C. § 924(c)(1)(A)(i); drive-by shooting, 18 U.S.C. § 36; discharge of a firearm in furtherance of a crime of violence, 18 U.S.C. § 924(c)(1)(A)(iii); maintaining a drug-involved premises, 21 U.S.C. § 856(a)(1) and (b); distribution of marijuana, 21 U.S.C. § 841(a)(1) and (b)(1)(D); distribution of marijuana near a school, 21 U.S.C. §§ 841(a)(1) and 860; four counts of distribution of heroin, 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)–(C); and four counts of distribution of heroin near a school, 21 U.S.C. §§ 841(a) and 860. He was sentenced to 420 months in prison.

David Duncan was convicted of conspiracy to distribute less than 100 grams of heroin and some amount of oxycodone, 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 846; drive-by shooting, 18 U.S.C. § 36; discharge of a firearm in furtherance of a crime of violence, 18 U.S.C. § 924(c)(1)(A)(iii); possession with intent to distribute oxycodone and hydrocodone, 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); possession of a firearm in furtherance of drug trafficking, 18 U.S.C. § 924(c)(1)(A)(i); and five counts of money laundering, 18 U.S.C. § 1956(a)(1)(B)(i). He was sentenced to 360 months in prison.

## 1. Evidentiary Rulings

Over Smith's and Duncan's objections, the CI testified to what Franklin had told him about the drive-by shooting. The district court ruled that the testimony was not hearsay because it was a statement "offered against an opposing party" and "made by the party's coconspirator during and in furtherance of the conspiracy." *See* Fed. R. Evid. 801(d)(2)(E). We review evidentiary decisions for abuse of discretion. *United States v. Goodman*, 88 F.4th 764, 767 (8th Cir. 2023).

A statement is not hearsay if the Government proves by a preponderance of the evidence that (1) a conspiracy existed, (2) the defendant and declarant were members of the conspiracy, and (3) the declaration was made during the course and in furtherance of the conspiracy. *United States v. Cathey*, 997 F.3d 827, 834 (8th

-13-

Cir. 2021). Smith and Duncan do not dispute the conspiracy's existence; that the CI, Franklin, Smith, and Duncan were members; or that the statements were made during the conspiracy. They argue only that the Government failed to prove that the statements were made "in furtherance of the conspiracy" because Franklin's statements about the drive-by shooting did not advance the conspiracy but merely informed the CI of past activities unconnected to the drug conspiracy. *See United States v. Mitchell*, 31 F.3d 628, 632 (8th Cir. 1994) ("A statement that simply informs a listener of the declarant's criminal activities is not made in furtherance of the conspiracy; instead, the statement must 'somehow advance the objectives of the conspiracy.'" (citation omitted)). And without a nexus between the statements and the conspiracy, they argue that the CI's testimony was inadmissible hearsay.

We disagree. Consider the context. The CI was becoming a more valuable and trusted member of the conspiracy when Franklin told him about the shooting. A few weeks before the shooting, Smith offered him distribution quantities of heroin, a drug the CI had not sold before. And for a $1,000 fee, Smith taught the CI his "million dollar game" recipe to cut heroin, reduce the drug purity, increase the quantity, and make more money on each sale.

When Franklin told the CI about the shooting immediately after returning to the Kensington Avenue house, he identified a threat the conspirators faced and taught the CI how they handled it. *See United States v. Darden*, 70 F.3d 1507, 1529 (8th Cir. 1995) (statements describing past events are "in furtherance of the conspiracy" if they "keep co-conspirators abreast of current developments and problems facing the group"); *see also United States v. Rivera-Donate*, 682 F.3d 120, 132 (1st Cir. 2012) (statements about related murder were "in furtherance of the conspiracy" because they "served to keep the members of the conspiracy up-to-date on important developments relating to the organization"). When Franklin relayed Duncan's command to kill the two men who were plotting an ambush, he was telling the CI that Duncan was a valuable member who relied on Franklin for protection. When Franklin told the CI that he and Smith went to protect Duncan and recounted the shooting, he gave context about their roles as enforcers within the conspiracy

-14-

and the group's reputation for violence and retaliation. *See United States v. Kitchen*, 149 F.4th 1019, 1025 (8th Cir. 2025) ("statements that identify a co-conspirator's role" are "in furtherance of the conspiracy"). So the district court neither clearly erred nor abused its discretion in finding that the statements were "in furtherance of the conspiracy." *See Goodman*, 88 F.4th at 767 (noting the "open question whether admissibility under Rule 801(d)(2)(E) is reviewed under an abuse of discretion standard or whether the 801(d)(2)(E) factfinding is first reviewed for clear error and the ultimate decision to admit or exclude is then reviewed for abuse of discretion").

Turning to the rap lyrics and gang affiliation, the district court denied Smith's and Duncan's motions to exclude the evidence as irrelevant and unfairly prejudicial. This evidence included five minutes of interview clips, including one where Duncan wore a 246-branded baseball hat and talked about how the group came together and their music. He referred to the 246 as "the gangway" and said that he "be talking that real shit, spittin' that real shit. . . . Everything 100% authentic." It also included seven minutes of clips from music videos that featured Smith rapping, with Duncan and others making appearances. For example, in one clip, Smith raps:

> Ah, shit. Gang, gang, gang.
> 246. Talk to them, bro.
> …
> Sellin' chicken out the window like I work at Popeyes.
> …
> All I talk is Gs. All I sell is units.
> …
> I sell dope, I don't sell Kush because that shit is slow.
> $15k profit every week, know I'm getting dough.
> …
> Gang. Gang. Gang. Gang. Gang. 246.

And in another, Smith raps:

> Got our pistols in the party, ops better not come in.
> Gripping on this ten, bro got the FN.

Yeah I killed ya mans, that 50 made him dance.
Got dissed by some rappers, they used to be my fans, damn.

This evidence was properly admitted. Its relevance is obvious, tending to show that Smith and Duncan were part of a drug-trafficking conspiracy. *See* Fed. R. Evid. 401; *United States v. Moore*, 639 F.3d 443, 448 (8th Cir. 2011) ("The recordings [of the defendant rapping] were relevant to prove that he knew cocaine prices, used drug code words, and sold drugs to supplement his income."). Smith's lyrics showed they knew the lingo, they knew about selling drugs, they knew about guns. The videos showed the defendants hanging out together with guns and cash. And the interview with Duncan explained the group's origins and suggested there was truth to the lyrics.

Against the high probative value of the evidence, we consider the danger of unfair prejudice. *See* Fed. R. Evid. 403. Unfair prejudice is "an undue tendency to suggest decision on an improper basis," *id.* advisory committee note, and we agree with the district court that there was little danger of that here. The district court explained that the evidence was limited both in time—"under 12 minutes of what will likely be a 3-week trial"—and in weight—"it is commonsense that not all music is autobiographical fact." D. Ct. Order of Aug. 22, 2022 at 13–14. The Government did not refer to 246 as a gang, and Smith's and Duncan's references to "gang" or "the gangway" were "not gratuitous or unfairly prejudicial." *Id.*; *see United States v. Gaines*, 859 F.3d 1128, 1131 (8th Cir. 2017) ("[G]ang-related evidence is often admissible where the defendant is a gang member himself, the issues in the case concern the mere fact of a defendant's gang membership rather than sanctioning a wide ranging inquiry into the generic criminality and violent dispositions of gangs, and the evidence is generally an unavoidable incident of presenting other permissible evidence." (cleaned up)). The music videos and interview were prejudicial only "in the sense of being detrimental to" Smith's and Duncan's cases, which is not unfair prejudice.[4] *See United States v. Huyck*, 849 F.3d 432, 440 (8th Cir. 2017).

_____

[4]Smith and Duncan claim that the admission of the rap lyrics violated their First, Fifth, and Sixth Amendment rights, but neither developed any argument for

-16-

Smith and Duncan complain that the Government insinuated that the 246 was a gang and that the jury found them guilty by association. But this case is not like the one they rely upon, *United States v. Roark*, 924 F.2d 1426 (8th Cir. 1991). There, the Government called an expert witness and an undercover agent to testify about the nationwide Hell's Angels motorcycle club, its structure and numerous chapters, and its illegal drug activities. *Id.* at 1430–31. The "theme of the trial" was "guilty by association," and the Government "relentless[ly] attempt[ed] to convict Appellant through his association with the motorcycle club." *Id*. at 1434, 1432. Here, the defendants' association with the 246 did not secure their convictions. The evidence proved each defendant's role in the conspiracy and individual criminal conduct. *See United States v. Ellison*, 616 F.3d 829, 834 (8th Cir. 2010) ("Our concern under Fed. R. Evid. 403 is that the relevance of gang related evidence not be overwhelmed by the risk that the jury will rest a guilty verdict solely on a defendant's gang affiliation."). The evidence also proved that this specific, local group—the Kansas City-based 246—both made music and trafficked drugs, so there was nothing improper about the Government calling the 246 a drug-trafficking organization in opening statement or closing argument. *See United States v. Shoff*, 151 F.3d 889, 893 (8th Cir. 1998) (no prosecutorial misconduct when "opening was limited to describing what the government would attempt to prove" and "closing was carefully limited to arguing what the evidence had proved").

2. Sufficiency of the Evidence for the Drive-by Shooting Convictions

The drive-by shooting statute prohibits firing a weapon into a group of two or more people "*in furtherance . . . of a major drug offense* and with the intent to intimidate, harass, injure or maim." 18 U.S.C. § 36(b)(2) (emphasis added); *see id.* § 36(a)(2) (defining "major drug offense" to include drug-trafficking conspiracies).

---

reversal or for excluding the evidence based on their constitutional rights. *See United States v. Midder*, 139 F.4th 649, 652 n.3 (8th Cir. 2025) (declining to consider an argument where defendant made only a "passing reference" to it and did not cite any legal authority).

Smith and Duncan argue that the evidence was insufficient to establish that the September 2019 shooting was "in furtherance of" the drug-trafficking conspiracy.[5] We review sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the jury's verdict. *United States v. Blamah*, 143 F.4th 1010, 1015 (8th Cir. 2025). We affirm "unless no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Id.* (citation omitted).

The evidence showed that Smith shot into a group of two or more people, causing grave risk of harm to human life. After Duncan called for protection, Franklin went to the Kensington Avenue house in his Cadillac. The pole camera showed Franklin loading guns into a black Jeep in the driveway at 7:07 p.m. The CI testified that Smith joined Franklin, and city cameras recorded the Jeep driving west toward the intersection of 35th and Woodland. The Shot Spotter system recorded shots fired. Franklin's cell phone pinged near the area. Video from the pole camera showed the Jeep return to the Kensington Avenue house at 7:21, where the men exited and walked toward the door. Agent McKelway identified Franklin and Smith, with Smith holding a gun in his right hand.[6] Casings from the scene matched guns that were later seized from the Jeep and the Kensington Avenue house. The CI told the jury what Franklin said happened.

And a reasonable jury could find that the shooting was in furtherance of the drug-trafficking conspiracy. Franklin and Smith answered the call to protect Duncan, who was an important member of the conspiracy. They met at the house

---

[5]Smith and Duncan ask to incorporate their hearsay arguments, but under Federal Rule of Evidence 801(d)(2)(E), we consider whether Franklin's statements to the CI were in furtherance of a conspiracy. For conviction, the record must support a finding that the shooting itself was in furtherance of the drug-trafficking conspiracy.

[6]Smith argues that "insufficient evidence exists to even place [him] at the scene of the alleged shooting," but the CI's testimony, the pole camera footage, and Agent McKelway's identification is enough.

where they stored guns and trafficked drugs. They grabbed guns from the house, shot at the men who were threatening Duncan, and returned to the house. We have said that the term "in furtherance of" means "furthering, advancing, or helping forward." *United States v. Fuget*, 137 F.4th 690, 691 (8th Cir. 2025) (citation omitted). So while there is no direct evidence about who the men were or the motive of the threats against Duncan, a fair inference—given the timing, the conspirators involved, and the circumstances—is that the shooting was related to drug-trafficking. And even if it wasn't, a reasonable jury could find that the shooting furthered the conspiracy by protecting Duncan and promoting the group's reputation for swiftly and violently responding to threats.[7] *See United States v. Flax*, 988 F.3d 1068, 1075 (8th Cir. 2021) (sufficient evidence to prove that defendant "was furthering the conspiracy by protecting the [gang's] reputation and influence and thus the organization's ability to further its criminal enterprise"); *United States v. Carter*, 481 F.3d 601, 611 (8th Cir. 2007) (holding certain acts of violence were "in furtherance of drug trafficking" when evidence indicated "protection" of the drug-trafficking conspiracy and "retaliation" against rivals), *reinstated in relevant part by* 538 F.3d 830, 831 (8th Cir. 2008).

### 3. Sentencing

Smith and Duncan objected to the drug-quantity findings in their presentence reports. The Guidelines instruct the district court to "approximate the quantity of the controlled substance" when the amount of drugs seized "does not reflect the scale of the offense." U.S.S.G. § 2D1.1 cmt. n.5. The court may convert seized or laundered money into drug quantities after considering "the price generally obtained" for the drug and "financial or other records." *See id.*; *United States v. Grays*, 638 F.3d 569, 571–72 (8th Cir. 2011). It may also "consider all transactions known or reasonably foreseeable to the defendant that were made in furtherance of

---

[7]Having affirmed the drive-by shooting convictions, we likewise affirm the convictions for discharging a firearm during and in relation to the drive-by shooting, 18 U.S.C. § 924(c)(1)(A)(iii).

the conspiracy." *United States v. Johnson*, 75 F.4th 833, 846 (8th Cir. 2023) (citation omitted). We review drug-quantity findings for clear error. *Id.*

Officers seized $32,127 in cash from Smith's home, which was converted into 321.27 grams of heroin based on evidence that heroin sold for $100 per gram. Officers seized $7,181 from Duncan's home, and financial records revealed that he laundered $272,231 through his bank account, which together was converted into 2,794.12 grams of heroin. Their presentence reports relied on these heroin amounts, which drove up their base offense levels and their Guidelines sentencing ranges. Smith specifically objected to the cash to drug-weight conversion, and the probation officer responded that the cash was converted because it was found at his home "along with firearms, drugs, cell phones, and other evidence of drug distribution activity." Duncan objected to "all the drug calculations" and "the drug weights used to calculate" his base offense level and argued that he should be held responsible only for the 108 grams of heroin he sold to a cooperating witness and the 10.35 kilograms of oxycodone found in his home. The district court overruled the objections and adopted the PSR's findings.[8]

Smith argues that the Government failed to prove that the seized cash was drug-trafficking proceeds, citing his success as a rapper. An IRS agent testified that Smith received approximately $28,000 from music aggregators but otherwise had no legitimate income. Of the cash officers seized from Smith's home, $20,000 was hidden in his closet, $1,600 was stacked next to his Gucci fanny pack on the couch, and $10,000 was tucked into the fanny pack, which Smith had been wearing at the Kensington Avenue house mere hours before his arrest. Officers also found codeine, expensive jewelry, cell phones, several magazines, and boxes of ammunition. The Government presented evidence of Smith's spending, including tens of thousands of dollars at an upscale department store and on rental cars. With evidence that Smith

---

[8]Smith and Duncan argue that the district court failed to make specific factual findings on the cash to drug-weight conversions, but the court relied on the evidence it heard at trial and probation's response to their objections, which is specific enough.

sold heroin, had little legitimate income, spent lavishly, kept an unusual amount of cash, and had been involved in a yearslong drug-trafficking conspiracy, the district court did not clearly err in converting the cash to heroin.

Duncan similarly argues that the Government failed to prove that the seized cash and laundered funds were heroin-trafficking proceeds. The evidence that Duncan had worked at a car dealership when he was a teenager and that his aunt occasionally gave him a few hundred dollars could neither account for the cash or laundered funds nor pay for his luxury apartment, designer clothes, expensive jewelry, or Dodge Challenger. So the money was drug money, and any error in converting it into heroin instead of oxycodone was harmless. The district court said, "If you had won all of your objections, I would have still come out in the same place . . . based upon 18 U.S.C. § 3553(a) and my review of those factors."[9] *See United States v. Fisher*, 965 F.3d 625, 632 (8th Cir. 2020) ("An incorrect Guidelines calculation is harmless error where the district court specifies the resolution of a particular issue did not affect the ultimate determination of a sentence, such as when the district court indicates it would have alternatively imposed the same sentence even if a lower guideline range applied." (citation omitted)).

Smith argues that the district court erred by increasing his offense level by 2 for possessing a firearm, U.S.S.G. § 2D1.1(b)(1), because the conduct was already punished in his consecutive 60-month sentence for possessing firearms in

---

[9]Citing *Booker*, Duncan argues that it was error to attribute the conspiracy's drug quantities to him—including the 295 grams found at the Kensington Avenue house—because the jury found that he conspired to distribute less than 100 grams of heroin. *See United States v. Booker*, 543 U.S. 220 (2005). But *Booker* did not disturb the precedent "that a sentencing judge could rely for sentencing purposes upon a fact that a jury had found *unproved* (beyond a reasonable doubt)." *Id.* at 251; *see Johnson*, 75 F.4th at 847 (a district court can rely on acquitted conduct at sentencing, "so long as that conduct has been proved by a preponderance of the evidence" (citation omitted)).

furtherance of a drug-trafficking crime, 18 U.S.C. § 924(c)(1)(A)(i).[10] *See* U.S.S.G. § 2K2.4 cmt. n.4 (specific offense characteristic for possession of a firearm does not apply to the underlying drug-trafficking offense when "a sentence under this guideline is imposed in conjunction with a sentence for an underlying offense"); *see United States v. Mays*, 967 F.3d 748, 753 (8th Cir. 2020) ("The Commission in Application Note 4 logically concluded that double counting occurs when a guidelines enhancement 'for possession . . . of an explosive or firearm' is imposed for an underlying offense when the total sentence will include consecutive punishment for a § 924(c) firearm offense." (citation omitted)). We agree, but the error was harmless. The district court said it would have imposed the same sentence even if it had sustained Smith's objection. *See Fisher*, 965 F.3d at 632.

## C. Gary Toombs

Gary Toombs was convicted of conspiracy to distribute 100 grams or more of heroin and some amount of mixture containing marijuana, 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846; conspiracy to possess firearms in furtherance of a drug-trafficking crime, 18 U.S.C. § 924(o); and maintaining a drug-involved premises, 21 U.S.C. § 856(a)(1) and (b). He was sentenced to 151 months in prison.

### 1. Sufficiency of Evidence on All Counts

Toombs argues that the Government failed to prove that he joined the conspiracy to distribute heroin and marijuana and to possess firearms in furtherance of drug-trafficking. But the evidence showed that Toombs rented the Kensington Avenue house, the utilities were in his name, and he went there occasionally. He

---

[10]The district court imposed concurrent 240-month sentences on his conspiracy, drive-by shooting, and heroin distribution convictions; concurrent 60- and 120-month sentences on his marijuana distribution convictions; and consecutive 60- and 120-month sentences on his convictions for possession of firearms in furtherance of a drug-trafficking crime and discharge of a firearm in furtherance of a crime of violence.

had a conversation with Smith about "black" or "black ops," during which Toombs said he had "a couple of plays that should land." Agent McKelway testified that "black ops" is a code word for heroin; and a Kansas City Police detective testified that "black" also means heroin. During another recorded conversation, Franklin said he had a half-pound of marijuana for $1,750, and Toombs replied that he would "be over when [he] g[o]t off." There was also surveillance video of Toombs leaving the Kensington Avenue house with a bulge under his shirt that McKelway testified was consistent with the size of a one-pound bag of marijuana. Based on this, a reasonable jury could find that Toombs knowingly and intentionally joined the conspiracy to distribute heroin and marijuana, that he knew of the drug trafficking that occurred and the cache of firearms that were kept at the Kensington Avenue house, and that he maintained the drug-involved premises. And the district court did not abuse its discretion when it denied Toombs a buyer-seller jury instruction, when the evidence showed that Toombs purchased the drugs for resale. *See United States v. Shavers*, 955 F.3d 685, 696 (8th Cir. 2020) (defendant not entitled to buyer-seller instruction "when the evidence shows that drugs are purchased for resale."); *United States v. Boykin*, 794 F.3d 939, 948 (8th Cir. 2015) ("Buyer-seller relationship cases involve only evidence of a single transient sales agreement and small amounts of drugs consistent with personal use." (cleaned up)).

## 2. Sentencing

Toombs's Guidelines sentencing range was 108 to 135 months in prison. The district court varied up to 151 months, citing Toombs's role in the conspiracy and his extensive criminal history, which included felony drug distribution and domestic violence convictions. Toombs argues that his sentence is substantively unreasonable because the conduct the court relied upon for the variance was already accounted for in the Guidelines calculations. Again, "[a] district court is not prohibited 'from determining that the weight the Guidelines assigned to a particular factor was insufficient,'" *Donahue*, 959 F.3d at 867 (citation omitted), and the district court did not abuse its discretion in imposing a sentence 16 months above the Guidelines range.

## III.  Conclusion

Affirmed.

_____